1 U.S. 180 (1786)
1 Dall. 180
PURVIANCE et al.
versus
ANGUS.
Supreme Court of United States.

M'KEAN, Chief Justice.
I will state the case as it appears before the Court from the proceedings, and the evidence, which are not controverted on either side; and shall then taken notice of those points which have been disputed.
The Appellants on the 28th day of August 1779, were owners of a Brigantine, called the Hibernia, then riding at anchor in the port of Philadelphia, and appointed the Respondent master and commander, on a voyage from thence to Oratavia in the island of Jeneriffe, having a commission as a Letter of Mart and Reprisal. The owners, in the sailing orders then delivered to the Respondent, (among other things) "advised him to keep company with the armed vessels bound to the Eastward as far as he should think it prudent; and that should they agree to cruize two or three weeks on the coast, he had their approbation in joining with them." The Respondent failed on his intended voyage, and in the river Delaware joined *181 the Brigantine Achilles, whereof George Thompson was master, and the Patty, whereof John Prole was master, each having a commission of Letter of Mart; and about the 1st of September following they proceeded to sea in company, standing to the Eastward.
On the 6th of September in the forenoon a firing of cannon was heard by people on board the Achilles and Patty, and in the afternoon the Achilles and Patty had altered their course, and, being swifter sailors than the Hibernia, left her at some distance; they then waited for her, and when she came up, she inquired the reason of their altering their course, and wa informed, that they had seen two fail and given them chase. At this time the two vessels were not in fight, the Achilles and Patty having waited for the Hibernia until they were lost: They all three then continued the same course until the morning, when at day light two vessels were descried, lying close together, by each of the masters of the three Brigantines, who forthwith made towards them; and the Achilles and Patty, after firing a few guns, took possession of a Brigantine, called the Betsey, which had been a British vessel, bound from Montserrat for New-York, (which places were then possessed by the Enemy) and was captured the day before by the Argo sloop of war, belonging to the United States, Silas Talbot, Esquire, Commander. At this juncture the Hibernia was a few miles aftern of the other Brigantines, and when she came up, the Respondent asked, "what vessel they had brought too?" and was answered, "a Brig from Montserrat bound for New-York; a good prize." In conseqence of some conversation with the Captains of the two other vessels, the Respondent failed in pursuit of the Argo, then in fight, and did not rejoin them, until near sun-sett, when a boat came along side from the Patty, and asked for men to assist in navigating the Betsey into some port: The Respondent immediately put two men into the boat, and signed Orders for William M`Neil, who had been appointed Prize-master, which contained these words, "to get her if possible into Delaware, Egg-harbour, or Chesepeak, for fear of the SLOOP Argo falling in with you, if you go to New-England;" and "beg of M`Neil to stand to the Southward this night and strive hard for Philadelphia." There orders are dated "the 7th September 1779, at sea on board the Brigantine Patty," and were signed first by John Prole and George Thompson. So far the facts are agreed.
Mr. William Davis, who was a passenger on board the Patty, swears, "that he verily believes, the firing of cannon on the 6th about ten o'clock in the forenoon, was heard on board the Hibernia, and that the people on board each of the three brigs saw two vessels engaged in fight, for that he heard and few them distinctly; that the three lay becalmed within hale of each other, that the Argo and Betsey were then about three leagues distant from the three Brigs, and that the firing continued more than an hour." He further is positive, that the Respondent and Prole and Thompson had a consultation in his presence, about the brig Betsey, whether she was prize *182 or not; and that they concluded to secure her as a prize, as they disbelieved what had been said by West and Church about her being prize to the Argo, or if she was, yet, as they had been in fight at the time of the capture, they were intitled to a share. These facts are also confirmed by the deposition of John Groves.
On behalf of the Respondent, the depositions of John Brice, first Mate of the Hibernia, John Magill, George Stout, George Eldridge and Aaron Ashbridge, mariners on board, and of Doctor Wilson Waters, Surgeon of the Hibernia, prove, that they did not see the Argo and Betsey, nor hear any firing of cannon, on the 6th of September, and that neither Captains Prole nor Thompson were on board the Hibernia on the 7th, nor was the Respondent on board of either of their vessels. In which last particular Davis and Groves concur, These witnesses also differ with Davis and Groves, about the hour that the Hibernia failed in pursuit of the Argo, the duration of the chase, and the time of her return and rejoining the other Brigs.
It has also been given in evidence, that a suit had been instituted in the Admiralty by Captain Silas Talbot quitam &c. against the owners of the three Brigantines, for the spoliation of the Betsey and her cargo, who, upon an Appeal to this Court were decreed to pay £.11,141. 5. 4. damages to the Libellant, besides the costs, of which sum the present Appellants, as owners of the Hibernia, paid £ .3,795. 3. 6. and towards costs on the 22d January 1785.[*]
Upon this state of the case, two Questions arise;  The 1st of fact; the 2d of law.
1. With respect to the fact, there are two points, 1st. Whether the Respondent did willingly join the two other Captains Prole and Thompson, in the tortious capture of the Betsey from the Argo, knowing her to have been a prize to the Argo, and that the Argo was a friend? This would undoubtedly have been a lata culpa, an evident trespass, to call it by no harsher name.
If he did not, then 2dly, Whether he was guilty of such gross negligence (crassa negligentia) as by law will make him responsible to the Appellants, considering the relation between them as owners and master of a vessel?
As to the 1st point, the evidence is not so satisfactory as might be wished in a case of such consequence to the parties. Had there been evidence given respecting the credit of the several witnesses, the matter would have been clearer. If Davis and Groves are to be credited, in addition to the other evidence, there is a very strong presumption indeed, that the Respondent is guilty of a great wrong, of a clear trespass; for if he saw the fight on the 6th, as he next day found that the Betsey, which had been captured, was an enemy, he must have concluded, that the Argo was a friend. And if all that the other witnesses swear in behalf of the Respondent, is true, yet I do not think, that the evidence of Davis and Groves is thereby invalidated. With respect to hours or times, in which particular occurrences or transactions happened, witnesses of the greatest integrity *183 regrity may and often do differ: This has happened in the cause before us. But as to other matters, the witnesses on board the Hibernia only swear, "that they did not see nor hear, what the others say, they did." The rule in such a case is, "that one affirmative witness countervails the proof of many negative, because both may swear true," and such interpretation should be put on the whole testimony, as to reconcile it; for, one may see and hear what another does not. Gilb. Law of Evidence 157. However, it does not appear necessary to determine this first point, as the second question admits of little difficulty, viz. Whether the Respondent has been guilty of such gross negligence as should make him responsible?
The Respondent was near to the Betsey, as well as the two other Letters of Marque; he might have gone on board her, and made every necessary and proper inquiry; he sent two of his crew on board her, to get her if possible into Delaware &c. he signed the order to M'Neil, the Prize-master, which must have shewn, to perfect conviction, that the Betsey had been captured by the Argo, and that she was a friend. But it is said, that he consided in Prole, whom they had made Commodore, and in Thompson; that they deceived him; and that he signed the orders to the Prize-master without reading them; and, in short, that he implicitly obeyed, and did whatever he was told to do. The Respondent should have reflected, that the seizing a valuable vessel and cargo was a serious piece of business, if belonging to a friend; he should therefore have weighed the consequences of his credulity in others; he could have inquired for himself, and had the same evidence with Prole and Thompson; he should have considered, that his owners placed their confidence in him, and in no other; he should have acted for himself, and taken care that he did no injury to any one. But he does not appear, by the defence made for him, to have exercised his own judgment at all. Was this using proper care and diligence, or was it inexcusable conduct, and gross negligence?
Let us now consider the law upon this evidence; for, ex facto critur lex. It is agreed, that every one of the parties to a trespass, who participates in it, is a trespasser, and an action will lie against him as a principal; for, there can be no accessory to a trespass: Bro. trespass, pl. 113. 1 Lev. 124. that a trespass was committed in taking and carrying away the Betsey from the Commander of the Argo; that the Respondent was present, aiding and assisting in the taking and carrying her away: and that Captain Silas Talbot could have maintained his suit against the Respondent, as well as against his owners, for the wrong and injury they have done to him. But, it is contended, that though he might be responsible to Captain Talbot, he is not so to his owners, for that his relation with them was by contract, and the contract between a servant and his master, or between a Captain of a ship and his Owners, points out the measure of the Servant's or Captain's responsibility; that he ought not to be accountable in damages for an error in judgment, but only for the faull of the heart, and that he acted according to the *184 best of his judgment; and his error in this business arose from the misinformation and deception of Prole and Thompson. In support of this doctrine were cited 1 Blackst. Com. 422. 389. 3 Bl. Com. 163. 3 Bac. Abr. 544. 564. 4 Co. 83. 84. 10 Mod. 109 4 Burr. 2060. 11 Mod. 135.
In reply to this, it has been agreed, that the master or commander of a Privateer or Letter of Marque may lawfully stop the ship of a friend, examine her papers, the people on board, the cargo &c. in order to discover, whether she belongs to a Friend, or an Enemy; and if upon the whole it should be doubtful, to bring her into port, for further inspection and trial, without breaking bulk, or imbezzlement of the lading. But if the captor imbezzled the cargo, disposed of or used any part of it. sent away the captured mariners, or did any other acts, which shew he could have no reasonable doubt, in such case he is liable for damages and costs. Lee on Captures 202. 240. Beawes L.M. 207. 1 Rolls Abr. 530.
It is insisted upon, that a master of a ship is one, who for his knowledge in navigation, fidelity and discretion, hath the government of the ship committed to his care and management; that he must give an account for the whole charge, and, upon failure, render satisfaction: And, therefore, if misfortunes happen, if they are either through the negligence, willfulness or ignorance of himself, or mariners, he must be responsible; and his owners may sue him for reparation of damages, jointly or separately, both according to the common law, and marine law. See 1 Vol. Laws of Admiralty 186. Beawes L.M. 49. Bath. Nisi Prius 24. 3 Keeble 444. 3 Bac. Abr. 564. 3 Black. 163.
A great loss then has been sustained by the injury done in the seizure of the Betsey; it will he heavy, and must finally fall upon the owners or master. If the bringing the Betsey too, for the purpose of enquiring whether she belonged to a friend or an enemy, was lawful, the subsequent conduct was unlawful, and the seizors became thereby trespassers ab initio.
This was a lata culpa in Prole and Thompson at least, the Respondent was present aiding and assisting in carrying her away from the Argo. If one does a trespass, and others do nothing but come in aid, yet all are principal trespassers. Bro. trespass. pl. 232. 20 Vin. Abr. 460. title trespass. pl. 3. and so. 466. Letter U. If A comes in aid of B, who beats me, yet he is a trespasser as well as B. 22 Ass. 43. If the conduct of the Respondent was not wilful and with full knowledge, yet it appears to us to have been a crassa negligentia, and that any reasonable man, upon inquiry, and the least reflection, upon reading the orders given to the Prize-master M'Neil, (and he ought to have read them) or upon the circumstances attending the whole transaction, must have been satisfied, that the Betsey was a prize to the Argo. It is a wrong position, that a master of a ship is not answerable for an error in judgment, but only for the fault of the heart, in civil matters. In criminal cases, as well in others as in a master of a ship, it is true. One non compos mentis is answerable civilly for *185 a wrong done to another. Reasonable care, attention, prudence, and fidelity, are expected from the master of a ship, and if any misfortune or mischief ensues from the want of them, either in himself or his mariners, he is responsible in a civil action. And it must appear very strange to any understanding, that the owners of a vessel should be answerable in damages for the misconduct of the master, merely because they appointed him master, and that the master, the actual malfeazor, should not be accountable over to them; that the innocent should suffer, and the guilty person go scot-fire. We know of no such law.
Upon the whole, THE COURT are of opinion, that the sentence of the Court of Admiralty be reversed;[*] and this Court do decree and adjudge, that the respondent do pay to the Appellants the Sum of £.3,795. 3. 6. and the interest thereof from the 22d day of January 1785, together with the costs by them paid in the former cause by Silas Talbot qui tam, against them and others, and also the costs of this suit in the Inferior Court, and that each party shall pay their own costs in this Court, the same to be taxed by the Register, or this Court.
The Counsel for the Respondent afterwards moved the Court for a re-hearing upon a suggestion of new evidence &c. and upon that occasion, Judge SHIPPEN made the following observations: 
SHIPPEN, Justice:
When this Court delivered their decree that the Respondent should pay to the Appellants the Sum of £. 3,795. 3. 6. they estimated the damages by what they conceived to be the value of the Vessel and Cargo, having then, I believe, no doubt but that the los; sustained was the proper measure of damages. The conduct of the Respondent, though certainly unjustifiable, appeared from the evidence to be attended with such favorable circumstances, that if the idea had been entertained that the damages were discretionary, and could have been legally diminished, I, as one of the Court, should certainly have given my voice for a much less sum. Whether the Court had, or had, not, such a discretionary power, was not made a question on the hearing, but has since occurred to me; and having met with a case which goes a great way towards establishing the principle, I should be willing to have the case re-heard as to this point. The case I allude to, is that of Russel v. Palmer in 2 Wils. 325. which was a special action on the case against an Attorney for negligence, in not charging the Defendant in execution within two terms after the judgment, whereby the Plaintiff lost his debt, the Defendant having obtained a Supersedeas, agreeably to a rule of the Court of Kings Bench, and had been discharged out of custody. On the trial of the cause before Lord Cambden, a verdict was given for the plaintiff for £. 3000. the whole debt, by the Chief Justice's direction. But, afterwards, on a motion for a new trial, the Chief Justice himself and the rest of the Court were of opinion, that he had misdirected the Jury in telling them, that they ought to find a verdict for the *186 whole debt, whereas the action, sounding merely in damages, the Jury ought to have been left at liberty to find what damages they thought fit. Accordingly a new trial was ordered, and on the second trial the Jury were told, that they might find what damages they pleased, and, on some favorable circumstances appearing for the Defendant, they found only £. 500. in damages.
The similarity of this case with that before the Court, inclines me strongly to admit a re hearing of the cause as to this point, whether, if the Court should be of opinion that the Respondent is answerable on the point of gross negligence, they are bound to estimate the damages by the real loss, or whether they may not mitigate them, according to the circumstances and degree of negligence in the Respondent.
THE COURT, on consideration, directed a re-hearing as to this point only; and, after argument, reducing the damages, they gave the following judgment:
The court do award, that the Respondent do pay to the Appellants the sum of £.948. 15. 10. 1-2. and the interest thereof from the 22d day of January 1785, together with the fourth part of the costs by them paid in the former cause by Silas Talbot qui tam against them and others; and also the costs of this suit in the Inferior Court; and that each party pay their own costs in this court; the whole of the aforesaid interest and costs to be taxed by the Register, or this Court.
NOTES
[*] See Ant. 95.
[*] See the evidence, and the sentence of the Admiralty, reported by the Honorable Judge of that Court, in the volume referred to ant. p. 95.